## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SMITH & WESSON HOLDING CORPORATION DERIVATIVE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No. 09-cv-30174-MAP |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Co-Lead Plaintiffs Art Bundy and Dwight M. Nance (together, "Co-Lead Plaintiffs"), by the undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Co-Lead Plaintiffs' counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     Co-Lead Plaintiffs bring this action derivatively for the benefit of nominal defendant Smith & Wesson Holding Corporation ("S&W" or the "Company") against current and former officers and directors of the Company seeking to remedy defendants' breaches of fiduciary duties and other violations of law in connection with the issuance of false and misleading statements concerning the Company's earnings and business prospects for fiscal year 2008.

### JURISDICTION

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Co-Lead Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

3.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.     Plaintiff Bundy is a shareholder of nominal defendant S&W, was a shareholder of S&W at the time of the wrongdoing alleged herein, and has been a shareholder of S&W continuously since that time. Plaintiff Bundy is a citizen of the State of Arkansas.

5.     Plaintiff Nance is a shareholder of nominal defendant S&W, was a shareholder of S&W at the time of the wrongdoing alleged herein, and has been a shareholder of S&W continuously since that time. Plaintiff Nance is a citizen of the State of California.

6.     Nominal defendant S&W is a Nevada corporation with its principal executive offices located at 2100 Roosevelt Avenue, Springfield, Massachusetts 01104. According to its public filings, S&W, through its subsidiaries, is one of the world's largest manufacturers of quality firearms and firearm safety/security products. S&W's common stock is traded on the NASDAQ stock exchange under the symbol "SWHC".

7.     Defendant Michael F. Golden ("Golden") has served as the President, Chief Executive Officer, and a director of the Company since December 2004. Defendant Golden is a citizen of the State of Connecticut.

8.      Defendant John A. Kelly ("Kelly") formerly served as the Chief Financial Officer of the Company from February 2004 to July 2008, and as Treasurer from February 2004 until September 2008. Defendant Kelly is a citizen of the Commonwealth of Massachusetts.

9.      Defendant Barry M. Monheit ("Monheit") is the Chairman of the Board of Directors, and has served as a director of the Company since February 2004. Defendant Monheit is a citizen of the State of Arizona.

10.     Defendant Robert L. Scott ("Scott") has served as a director of the Company since December 1999. Previously, Scott served as a consultant to the Company from May 2004 until his consulting agreement expired on January 31, 2006, President from December 1999 until September 2002, Chairman of the Company's wholly owned subsidiary, Smith & Wesson Corp., from January 2003 until December 5, 2003, and President of Smith & Wesson Corp. from May 2001 until December 2002. Prior to May 2001, Scott served as an executive of Smith & Wesson Corp. Defendant Scott is a citizen of the State of Arizona.

11.     Defendant Jeffrey D. Buchanan ("Buchanan") has served as a director of the Company since November 2004. Buchanan served from June 1986 until May 1996 as a business lawyer with the law firm of O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A. Defendant Buchanan is a citizen of the State of Arizona.

12.     Defendant John B. Furman ("Furman") has served as a director of the Company since April 2004. Furman was from January 1983 until August 1998 a senior member of the law firm of O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A.. Defendant Furman is a citizen of the State of Arizona.

13.     Defendant Colton R. Melby ("Melby") served as a director of the Company from May 2001 to January 2008. Defendant Melby is a citizen of the State of Texas.

14.    Defendant Mitchell A. Saltz ("Saltz") has served as a director of the Company since October 1998. Previously, Saltz served as Chairman of the Board and Chief Executive Officer of the Company from February 1998 through December 5, 2003. Defendant Saltz is a citizen of the State of Nevada.

15.    Defendant David M. Stone ("Stone") has served as a director of the Company since September 2006. Defendant Stone is a citizen of the Commonwealth of Virginia.

16.    Defendant I. Marie Wadecki ("Wadecki") has served as a director of the Company since September 2002. Defendant Wadecki is a citizen of the State of Michigan.

17.    Collectively, defendants Golden, Kelly, Monheit, Scott, Buchanan, Furman, Melby, Saltz, Stone and Wadecki are referred to herein as the "Individual Defendants."

18.    The following Individual Defendants serve or have served on the various Board committees as follows:

|  | Audit Committee[1] | Compensation Committee | Nominations and Corporate Governance Committee |
|---|---|---|---|
| Scott |  |  | 2010 |
| Buchanan | 2007-2010 | 2007-2010 |  |
| Furman | 2007-2010 | 2007-2010 | 2007-2008 |
| Stone |  | 2007-2010 | 2007-2010 |
| Wadecki | 2007-2010 |  | 2007-2010 |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control

---

[1] Audit Committee met 8 times in fiscal year 2009, 9 times in fiscal year 2008 and 6 times in fiscal year 2007. The Board met 14 times in fiscal year 2009, 10 times in fiscal year 2008 and 11 times in fiscal year 2007.

and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

20.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

21.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

    d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

22.     The Individual Defendants, as senior executives and as members of S&W's Board of Directors, were responsible for maintaining and establishing adequate internal accounting controls for the Company, and to ensure that the Company's financial and operational statements were based on accurate financial and operational information, and were not presented in a misleading manner.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

a.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.      transactions are executed in accordance with management's general or specific authorization; and

ii.     transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

23.     Furthermore, the members of the Company's Audit Committee, defendants Buchanan, Furman, and Wadecki, must comply with the obligations set forth in the Audit Committee Charter.  According to the Audit Committee Charter, the purpose of the Audit Committee is:

To oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

To provide assistance to the Board of Directors with respect to its oversight of the following:

•      The integrity of the Company's financial statements.

•      The Company's compliance with legal and regulatory requirements.

- The independent auditor's qualifications and independence.

- The performance of the Company's internal audit function, if any, and independent auditor.

To prepare the report that SEC rules require be included in the Company's annual proxy statement.

24.     The Audit Committee is required to meet at least once during each fiscal quarter, or more frequently as circumstances dictate. According to the Audit Committee Charter:

> As part of its goal to foster open communication, the Committee shall periodically meet separately with each of management, the director of the internal auditing department, if any, and the independent auditor to discuss any matters that the Committee, the independent auditor, or the internal auditor, if any, believe would be appropriate to discuss privately. In addition, the Committee should meet with the independent auditor and management periodically to review the Company's financial statements in a manner consistent with that outlined in this Charter.

25.     The Audit Committee's primary responsibilities and duties include, among other things:

a.     Discuss with management and the independent auditor, prior to public dissemination, the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss with the independent auditors the matters required to be discussed by Statement of Auditing Standards No. 61.

b.     Discuss with management and the independent auditor, prior to the Company's filing of any quarterly or annual report, (a) whether any significant deficiencies in the design or operation of internal control over financial reporting exist that could adversely affect the Company's ability to record, process, summarize, and report financial data; (b) the existence of any material weaknesses in the Company's internal control over financial reporting; and (c) the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

c.     Discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), as well as financial

information and earnings guidance provided to analysts and rating agencies.

d.  Discuss with management and the independent auditor the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.

e.  Oversee the work of any accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company, including resolving any disagreements between management and the independent auditor regarding financial reporting.

f.  In consultation with the independent auditor, management, and the internal auditor, if any, review the integrity of the Company's financial reporting processes, both internal and external. In that connection, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding (a) all critical accounting policies and practices to be used by the Company and the related disclosure of those critical accounting policies under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (c) all alternative treatments of financial statements within generally accepted accounting principals that have been discussed with the Company's management, the ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent auditor; (d) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (e) major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies; (f) issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period; (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company; (h) any significant matters arising from any audit, including audit problems and difficulties, whether raised by management, the internal auditor, if any, and the independent auditor, relating to the Company's financial statements; and

(i) any other material written communications between the independent auditor and the Company's management, including any "management" letter or schedule of unadjusted differences.

g.      Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

h.      Review with the independent auditor any audit problems or difficulties encountered and management's response thereto. In this regard, the Committee will regularly review with the independent auditor (a) any audit problems or other difficulties encountered by the auditor in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management and (b) management's responses to such matters. Without excluding other possibilities, the Committee may review with the independent auditor (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company.

i.      Obtain from the independent auditor assurance that the audit of the Company's financial statements was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, which sets forth procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

j.      Discuss the scope of the annual audit and review the form of the opinion the independent auditor proposes to issue.

k.      Review and discuss with management and the independent auditor the responsibilities, budget, and staffing of the Company's internal audit function, if any.

l.      Review periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.

26.     Furthermore, the members of the Company's Compensation Committee, defendants Buchanan, Furman and Stone, must comply with the obligations set forth in the Compensation Committee Charter. According to the Compensation Committee Charter, the purpose of the Compensation Committee is:

1.  To determine, or recommend to the Board of Directors for determination, the compensation of the Chief Executive Officer ("CEO") of the Company.

2.  To determine, or recommend to the Board of Directors for determination, the compensation of all other executive officers of the Company.

3.  To discharge the responsibilities of the Board of Directors relating to the Company's compensation programs and compensation of the Company's executives.

4.  To produce an annual report on executive compensation for inclusion in the Company's annual proxy statement in accordance with applicable rules and regulations of the NASDAQ Stock Market, Securities and Exchange Commission (the "SEC"), and other regulatory bodies.

27.  The Compensation Committee is required to meet as frequently as necessary to effectively carry out its duties and responsibilities, which include, among other things, to "[e]valuate the performance of the CEO and other executive officers in light of [corporate] goals and objectives and, based on such evaluation, approve, or recommend to the full Board of Directors the approval of, the annual salary, bonus, stock options, and other benefits, direct and indirect, of the CEO and other executive officers." The full list of duties and responsibilities of the Compensation Committee, as set forth in the Compensation Committee Charter, is as follows:

*Setting Compensation for Executive Officers and Directors*

1.  Establish and review the overall compensation philosophy of the Company.

2.  Review and approve the Company's corporate goals and objectives relevant to the compensation for the CEO and other executive officers, including annual performance objectives.

3.  Evaluate the performance of the CEO and other executive officers in light of those goals and objectives and, based on such evaluation, approve, or recommend to the full Board of Directors the approval of, the annual salary, bonus, stock options, and other benefits, direct and indirect, of the CEO and other executive officers.

4.  In approving or recommending the long-term incentive component of compensation for the CEO and other executive officers, the Committee should consider the Company's performance and relative stockholder return, the value of

similar incentive awards to CEOs and other executive officers at comparable companies, and the awards given to the CEO and other executive officers in past years. The Committee is not precluded from approving awards (with the ratification of the Board of Directors) as may be required to comply with applicable tax laws, such as Rule 162(m).

5.      In connection with executive compensation programs, the Committee should do the following:

- Review and recommend to the full Board of Directors, or approve, new executive compensation programs;

- Review on a periodic basis the operations of the Company's executive compensation programs to determine whether they are properly coordinated and achieving their intended purposes;

- Establish and periodically review policies for the administration of executive compensation programs; and

- Take steps to modify any executive compensation program that yields payments and benefits that are not reasonably related to executive and corporate performance.

6.      Establish and periodically review policies in the area of senior management perquisites.

7.      Consider policies and procedures pertaining to expense accounts of senior executives.

8.      Review and recommend to the full Board of Directors compensation of directors as well as directors' and officers' indemnification and insurance matters.

9.      To the extent not delegated to the Audit Committee by the Board of Directors, review and approve all related party transactions (as specified in Item 404 of Regulation S-K) and review and make recommendations to the full Board of Directors, or approve, any contracts or other transactions with current or former executive officers of the Company, including consulting arrangements, employment agreements, change-in-control agreements, severance agreements, termination arrangements, and loans to employees made or guaranteed by the Company.

*Monitoring Incentive- and Equity-Based Compensation Plans*

10.     Review and make recommendations to the full Board of Directors with respect to, or approve, the Company's incentive-compensation plans and equity-based plans, and review the activities of the individuals responsible for administering those plans.

11.     Review and make recommendations to the full Board of Directors, or approve, all equity compensation plans of the Company that are not otherwise subject to the approval of the Company's stockholders.

12.     Review and make recommendations to the full Board of Directors, or approve, all awards of shares or share options pursuant to the Company's equity-based plans.

13.     Monitor compliance by executives with the rules and guidelines of the Company's equity-based plans.

14.     Review and monitor employee pension, profit sharing, and benefit plans.

15.     Have the sole authority to select, retain, and/or replace, as needed, any compensation or other outside consultant to be used to assist in the evaluation of director, CEO, or senior executive compensation. In the event such a consultant is retained, the Committee shall have the sole authority to approve such consultant's fees and other retention terms.

*Reports*

16.     Prepare an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with applicable rules and regulations of NASDAQ, the SEC, and other applicable regulatory bodies.

17.     Report regularly to the Board of Directors with respect to matters that are relevant to the Committee's discharge of its responsibilities and with respect to such recommendations as the Committee may deem appropriate. The report to the Board of Directors may take the form of an oral report by the Chairman or any other member of the Committee designated by the Committee to make such report.

18.     Maintain minutes or other records of meetings and activities of the Committee.

## FACTUAL ALLEGATIONS

28.     Between June 14, 2007 and December 6, 2007 (the "Relevant Period"), the Individual Defendants knowingly caused the Company to issue materially false and misleading financial statements about the Company's financial results and its failure to establish adequate internal and financial controls.

29.     In breach of both their fiduciary duty of good faith and, with respect to the members of the Audit Committee, their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants willfully ignored the obvious and pervasive problems with

the Company's accounting practices and its lack of adequate internal and financial controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

30.     During the Relevant Period, the Individual Defendants knowingly caused the Company to make a series of false and misleading statements concerning the Company's financial statements and the financial condition of the Company.  S&W, with the knowledge, approval and/or acquiescence of the Individual Defendants, concealed from its shareholders that the Company's projected performance was not sustainable in light of weakened demand for its products.  Rather than acknowledge that 2007's performance was not repeatable, the Individual Defendants knowingly permitted the Company to increase manufacturing in order to create the appearance of continued growth.  As a result of these materially false and misleading statements, the Individual Defendants falsely inflated the Company's stock price, caused the Company to incur damages in the form of increased financing costs and lost proceeds in connection with the Company's 2008 equity offering, and subjected the Company to investigation costs and other damages associated with the Company's improper business practices, even though the Individual Defendants knew that the information provided to the investing public was untruthful, and knew that their conduct was harming the Company.

*The Company's False and Misleading Statements*

31.     On June 14, 2007, Individual Defendants caused the Company to issue a press release announcing S&W's financial results for FY07, which press release stated in relevant part:

> SPRINGFIELD, Mass., June 14, 2007 — Smith & Wesson Holding Corporation (NASDAQ: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for the fiscal year and the fourth fiscal quarter ended April 30, 2007.

* * *

*Operational Improvements*

Golden added, "We continued to make significant operating improvements throughout fiscal 2007. Our Springfield factory delivered enhancements to manufacturing processes, supply chain management, and lean manufacturing practices. We began implementing the Smith & Wesson Operating System at our Thompson/Center facility shortly after the acquisition in January 2007 and have increased long gun barrel production by 26%. We continue to explore various operating synergies between the Smith & Wesson and Thompson/Center operating facilities. We invested $14.6 million in fiscal 2007 throughout our factories to upgrade and purchase manufacturing equipment, geared primarily toward increasing capacity and improving manufacturing processes."

**Outlook for Fiscal 2008**

We are raising our sales expectations for fiscal 2008 from $320 million to $330 million, which would represent a 40.5% increase over fiscal 2007 sales. This increased sales expectation includes growth in our existing sporting goods channel and our continued penetration of the law enforcement and international markets. It also reflects a full fiscal year of impact from our Thompson/Center acquisition. The increased sales expectation does not include any significant revenue from federal government orders, nor does it include the results of any potential future diversification initiatives. The M&P pistol and tactical rifle series, along with our new shotgun and bolt-action rifle lines, are expected to be drivers in the sales increase for fiscal 2008.

Net income for fiscal 2008 is anticipated to be $28.0 million, or $0.62 per diluted share, double the earnings per diluted share for fiscal 2007. Our increased expectation of $0.62 per diluted share in net income reflects an increase over our previously announced guidance of $0.60. This increase is expected to result from higher expected sales volume, improvement in gross margin percentage to between 35% and 36%, a decline in operating expenses as a percentage of sales and licensing, and a full fiscal year of impact from our Thompson/Center acquisition. Because of the acquisition, the seasonality of the hunting segment will now be reflected in our quarterly results. Therefore, our first quarter (May through July) of fiscal 2008 will be our weakest quarter, while results in our second quarter (August through October), traditionally a strong quarter for hunting sales, will improve substantially over results for the second quarter of fiscal 2006. We began the year with a strong order backlog and as a result, we expect earnings for the first quarter of fiscal 2008 to now be $.09 per diluted share compared with $.08 per diluted share for the first quarter of fiscal 2007 and expect that the subsequent quarters through fiscal 2008 will increase more significantly on a year-over-year basis.

We expect positive cash flow in fiscal 2008 of approximately $41 million, with net cash flow of approximately $23.0 million after capital expenditures of $17.7 million. We now participate in the hunting segment of the firearms industry, which traditionally offers its authorized dealers extended payment terms that do not come due until after the fall hunting season. These extended terms will

significantly impact first half cash flow. In addition, a significant portion of our capital expenditures are expected to occur in the first half of fiscal 2008. These factors combined with our traditional first quarter expenditures for profit sharing, bonuses and insurance premiums, will result in a negative cash flow for the first half, positive cash flow in the third quarter, and a strengthening of positive cash flow in the fourth quarter.

We expect capital expenditures in fiscal 2008 of $17.7 million, funded entirely by cash flow from operations. Planned capital expenditures in fiscal 2008 are based upon growth in the firearms business and exclude any new business opportunities we may pursue. (Emphasis added.)

32.     Also on June 14, 2007, defendants Golden and Kelly participated in an earnings conference call concerning the Company's announcement of its financial results and its projections for FY08. During the conference call, defendants Golden and Kelly affirmed the strength of the demand for the Company's handguns. According to Golden and Kelly, the Company was set to increase production capacity to meet this demand, thus increasing revenue at the Company:

Planned capital expenditures for fiscal 2008 of $17.7 million represents a $1.7 million increase from our previous estimate and allows for an expansion of our polymer pistol manufacturing capacity due to increased demand. Depreciation expense of $8 million remains unchanged from our previous projection.

As a result of the increased profitability, we expect positive cash flow of over $40 million for fiscal 2008 with net cash flow of $23 million after capital expenditures of $17.7 million. We expect receivables to increase as a result of the higher sales volume, with inventories also increasing due to volume, but at a much slower rate.

* * *

Operational improvements in all our factories throughout fiscal 2007 drove gross margins to an unprecedented level and gave us increased manufacturing capabilities on many fronts. We made substantial investments in our pistol manufacturing capacity, as the growth and demand exceeded 59%. At the same time, we increased our tactical rifle capacity by supplementing it with internal manufacturing in calendar 2007. (Emphasis added.)

33.     In affirming the Company's guidance for 2008, defendant Kelly stated as follows:

Well, the guidance that we put out is, we don't have any, as we said, any federal government, large federal government contracts in it.

But as we typically do, we have for the last two and a half years that I've been here, is we tell you guys what we see as the numbers that we're going to deliver for the year, and we adjust when we see things that are tangible that just give us a reason to tell you differently. Whenever we've gotten a big military contract, we've adjusted our guidance.

So as we look in the business, we ended the year with pretty good backlog. Demand has been strong, and that's -- the Thompson, our capacity in Thompson, we've gotten our barrel output up by 20% in the first whatever it's been, five months, that we've had it.

So we're putting all those together, and that's why we reacted confidently with our new guidance.

34.     Similarly, according to defendant Kelly:

The sporting goods channel you should assume that we will grow our business in the sporting goods channel at a double-digit rate, in about the mid teens. Now last quarter was the second anniversary quarter of the change, and again we grew by 30% in the sporting goods channel.

Now you add on top of that long guns, remember the long gun market is 80% larger than handguns. But, what you're going to see from us in fiscal 2008, and we've said this for a while now, is we're just ramping up our shotgun production. The season's in the fall.

Our hunting rifle, both Thompson and the Smith & Wesson bolt-action rifle will go into production in July. So we're just not going to have much product in the market this year. The real impact of Smith & Wesson in the long-gun market will be in fiscal '09 for next year.

35.     On July 16, 2007, the Individual Defendants caused the Company to file with the

SEC the 2007 10-K, which reiterated the results contained in the June 14, 2007 press release and

discussed in the June 14, 2007 conference call.  According to the 2007 10-K:

We are continuing our efforts to enhance our manufacturing productivity in terms of increased daily production quantities, increased operational availability of equipment, lower machinery down time, extension of machinery useful life, reduced overtime, increased efficiency, and enhanced product quality. The recent introduction of new production methods and additional machinery has resulted in significant improvements in our production. For example, we have been able to increase our average daily handgun production by 145% from May 2004 to May 2007 while improving product quality, reducing waste, and reducing overtime. The significant growth of our business, however, requires us to continue to increase our manufacturing capacity. For example, during the last two fiscal

years, we have been unable to satisfy on a timely basis the consumer demand for a number of our most popular new products, including our M&P Series of pistols and our M&P15 tactical rifles. We plan to continue to seek gains in manufacturing efficiency and capacity.

* * *

A key element of our strategy is to enhance our manufacturing productivity in terms of added capacity, increased daily production quantities, increased operational availability of equipment, lower machinery down time, extension of machinery useful life, reduced overtime, increased efficiency, and enhanced product quality. The recent introduction of new production methods and additional machinery has resulted in significant improvements in our production. For example, we have been able to increase our average daily handgun production by 145% from May 2004 to May 2007 while improving product quality, reducing waste, and reducing overtime. The significant growth of our business, however, requires us to continue to increase our manufacturing capacity. For example, during the last two fiscal years, we have been unable to satisfy on a timely basis the consumer demand for a number of our most popular new products, including our M&P Series of Pistols and our M&P15 tactical rifles. We plan to continue to seek gains in manufacturing efficiency and capacity. (Emphasis added.)

36.    On September 6, 2007, Individual Defendants caused the Company to issue a press release announcing S&W's financial results for 1Q08, which press release stated in relevant part:

SPRINGFIELD, Mass., September 6, 2007 — Smith & Wesson Holding Corporation (NASDAQ Global Select: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for its first fiscal quarter ended July 31, 2007.

Record revenue of $74.4 million for the quarter ended July 31, 2007 reflects an increase of 56.3% over the comparable quarter last year. Revenue from the sale of firearms for the quarter ended July 31, 2007 grew 55.2% over the comparable quarter last year. Excluding revenue from Thompson/Center Arms, a rifle maker we acquired in January 2007, revenue increased by 17.8% over the comparable quarter last year.

Net income for the quarter was $4.7 million, or $0.11 per diluted share, compared with $3.4 million, or $.08 per diluted share, for the comparable quarter last year.

Smith & Wesson President and CEO Michael F. Golden said, "Our results for the first quarter of fiscal 2008 demonstrate progress across many initiatives and reflect growth in our core handgun business as well as our newly established long

gun business. Our sales growth was particularly strong given that the comparable quarter of the prior year included $5.2 million in U.S. government orders for Afghanistan that were not duplicated in the current quarter. Handgun sales into the retail channel increased by 41.0% for the quarter, driven by our direct sales force and a number of ongoing retail initiatives. We continued to penetrate the law enforcement channel in the first quarter. Our Military & Police (M&P) polymer pistols have a cumulative win rate of over 80% in all test and evaluation processes in which they have competed. The number of law enforcement agencies that have purchased or approved for carry our M&P pistol has now grown to 231, including recent wins at sizeable agencies such as the Hartford, Connecticut Police and the New Hampshire State Police."

Golden continued, "On the diversification front, we continued to deliver as well. Long guns, a category that we entered in late fiscal 2006, accounted for over 25% of our revenue for the quarter. We continue to be extremely pleased with our acquisition of Thompson/Center, which has now delivered its second consecutive quarter of 22% revenue growth. We have commenced production on our Thompson/Center ICON™ and our Smith & Wesson i-Bolt™ bolt-action rifles, and both of these new category entries are beginning to arrive in retail locations. We have also commenced shipments of our Smith & Wesson shotguns. They are beginning to arrive in retail locations as well. As we have stated, our goal is to become a significant player in the $1.1 billion long-gun market."

Golden added, "We are very pleased with our profit performance on a number of fronts. Gross margin for the quarter was 36.4%, an increase of 170 basis points over our gross margin of 34.7% for the comparable quarter last year. Operating income increased by 66.7% over the comparable quarter last year, driven by the combination of higher sales and improved gross margins. Both our revenue and our earnings came in above our expectations. It should be noted that our stronger-than-expected results in the first quarter reflect not only growth in our business but also the integration of Thompson/Center and the impact of hunting on our traditional seasonality."

***Outlook for Fiscal 2008***

We continue to expect revenue to increase to approximately $330 million in fiscal 2008, which would represent a 40% increase over fiscal 2007 revenue. This revenue expectation does not include the results of any potential future, diversification initiatives, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government, and international markets. Sales of our M&P pistols, M&P tactical rifles, our new shotguns and both of our new lines of hunting rifles are all expected to be key drivers of the revenue increase for fiscal 2008. We expect second quarter revenue to increase by approximately 60% over revenue in second quarter of fiscal 2007, driven by continued expansion in our existing markets and the addition of revenue from Thompson/Center.

We are increasing our expectations for fiscal 2008 net income to approximately $28.5 million, or $0.63 per diluted share, which is higher than our earlier expectation of $28.0 million, or $0.62 per share. These results would represent an increase of 119% over net income for fiscal 2007. While first quarter results were $0.02 per diluted share higher than our expectations, approximately one-half of this increase was due to timing on depreciation expense. Our capital expenditures for the first quarter were lower than anticipated, though we still expect to spend $17.7 million in fiscal 2008. We continue to expect gross margin improvement to the range of 35% to 36% for the full fiscal year, with second quarter gross margins of approximately 33%, reflecting the impact of the annual two week plant shutdown which occurs each August at our Springfield and Houlton facilities. The 33% gross margin reflects a 180 basis point increase over the second quarter of fiscal 2006. The seasonal nature of the hunting business will be reflected in higher marketing expenditures in the second quarter as a result of our increased advertising efforts during this peak buying period. We still expect operating expenses to be in the 20% to 21% range for the full fiscal year.

We continue to expect positive cash flow in fiscal 2008 of approximately $41 million, with net cash flow of $23.0 million after capital expenditures of $17.7 million. We also continue to expect cash flow for the first half of fiscal 2008 to be negative, becoming positive in the third quarter and strengthening in the fourth quarter.

Golden concluded, "We are extremely pleased with our progress to date. We are excited about delivering new long gun products and look forward to establishing a prominent position in that very sizeable market. We continue to explore opportunities to diversify, and we remain committed to our growing presence in the areas of safety, security, protection and sport." (Emphasis added.)

37.    Also on September 6, 2007, defendants Golden and Kelly participated in an earnings conference call concerning the Company's 1Q08 financial results.  During the call defendant Golden stated that:

Our results for the first quarter are a great way to start the new fiscal year. To recap, we continue to deliver double digit growth in year-over-year quarterly revenue, supported by strong sales into the retail channel and our ongoing penetration in law enforcement.

We delivered double digit growth in our operating income and our net income as well, and we are raising our expectations for the full year net income. We continue to be extremely pleased with our integration of Thompson/Center Arms which again delivered tremendous growth, and we commence production this quarter of our two new bolt action hunting rifles and shipment of our new shotguns. This long list of accomplishments demonstrates great progress across many initiatives, so now, let me break it down and get into some detail.

The results we delivered this quarter in the retail channel reflect growth in our core handgun business as well as the addition of and growth in our newly established long gun business. The results also demonstrated the success of our all-encompassing retail strategy which incorporates a direct salesforce backed up with solid marketing and merchandising programs. Smith & Wesson firearms sales into the retail channel, not counting the positive impact of Thompson, increased by 41% for the quarter.

I want to point out that our sales growth was particularly strong during the first quarter given that it compares to some major events that occurred in the comparable quarter in the prior year. On the Federal Government front, last year's first quarter results included approximately $5 million in shipments for Afghanistan that did not recur in the current quarter. While we have won all major new orders issued by the Federal Government in the last two years, no new major orders have been issued recently. (Emphasis added.)

38.    In the same call, defendant Golden had the following exchange with analyst Eric

Wold in which Golden boasted of the Company's prospects:

ERIC WOLD: Quick question to make sure I heard things correctly. Were revolver sales up 38.8% in the quarter?

MICHAEL GOLDEN: That's correct.

ERIC WOLD: What particularly drove that strength in the quarter, versus kind of what we obviously, the way we've always have been in the past few quarters?

MICHAEL GOLDEN: We have increased capacity on revolvers at the end of last year going into this quarter.

ERIC WOLD: Okay, so would that be kind of a sense of Q1 kind of a makeup of fulfilling demand that's been there you couldn't get before or do you think the strength will continue?

MICHAEL GOLDEN: What we're seeing is small frame revolvers are pretty hot right now, and there's more states are increasing their concealed carry ability, so small frame revolvers are really driving a lot of that growth, Chris, and we don't really see that slowing down. (Emphasis added.)

39.    Similarly, defendants Golden and Kelly had the following exchange with analyst

Reed Anderson concerning the Company's future growth:

REED ANDERSON: Thank you, real quick, before I do a couple questions, John, could you just repeat what were pistol sales up year-over-year, what was that growth rate?

JOHN KELLY: 1.2% with that before you take into account the $5 million that went out that was Afghanistan last year, and excluding that, I believe it was 38% was the growth.

REED ANDERSON: Got it and out of curiosity as you dig into that growth you're seeing in pistols and just handguns in general, is a lot of that still the newer models driving that or are you still seeing the stuff you'd introduced a year or two ago actually growing year-over-year as well?

MICHAEL GOLDEN: Well, the M&P was up 63%.

REED ANDERSON: Okay.

MICHAEL GOLDEN: <u>So certainly the M&P is driving, and has been driving our growth in pistols.</u> (Emphasis added.)

40.     On September 10, 2007, the Individual Defendants caused the Company to file with the SEC the 1Q08 10-Q, which reiterated the results contained in the September 6, 2007 press release and discussed in the September 6, 2007 conference call. According to the 1Q08 10-Q:

> <u>The major capital expenditures will focus on increasing pistol production capacity to meet increased demand, primarily our pistol product line,</u> tooling for new product offerings, and various projects designed to increase capacity and upgrade manufacturing technology.
>
> * * *
>
> Cash used for investing activities increased by $2,706,242 for the three months ended July 31, 2007 over the three months ended July 31, 2006. Capital spending for the three months ended July 31, 2007 was $6,116,462 compared with $3,410,079 for the three months ended July 31, 2006, an increase of $2,706,383. We expect to spend approximately $17.7 million on capital expenditures in fiscal 2008. <u>The major capital expenditures will focus on increasing pistol production capacity to meet increased demand, primarily our pistol product line, tooling for new product offerings, and various projects designed to increase capacity and upgrade manufacturing technology.</u> (Emphasis added.)

41.     The statements set forth in ¶¶31-40 were false and misleading when made because the Individual Defendants knew, but failed to disclose, that the Company's projected performance was not sustainable in light of weakened demand for its products. Rather than acknowledge that 2007's performance was not repeatable, the Individual Defendants knowingly

permitted the Company to increase manufacturing in order to create the appearance of continued growth. The Individual Defendants knew that these statements, which were based upon and related to the Company's prior success, and indicated future performance, were false and misleading because the Company's growth was not sustainable.

*The Truth is Revealed*

42.    On October 29, 2007, Individual Defendants caused the Company to issue a press release that contained the Company's preliminary financial results for 2Q08. The preliminary financial results were a dramatic departure from the Company's prior earnings guidance. Specifically, the Company revised downward its earnings guidance by 16% - a total of $5 million, or $0.10 per share. According to the press release, the guidance reduction was due in part to "lower than expected consumer demand," and "a buildup of pre-season retail inventories." According to the October 29, 2007 press release:

> SPRINGFIELD, Mass., October 29, 2007 — Smith & Wesson Holding Corporation (NASDAQ Global Select: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced preliminary financial results for its second fiscal quarter which ends October 31, 2007.

> Based on preliminary financial data, the Company currently expects to report revenue for the second quarter of fiscal 2008 in the range of $69.0 million to $71.0 million compared with revenue of $50.8 million for the comparable quarter last fiscal year, reflecting revenue growth in the range of 36% to 40%. The Company expects to report earnings for the second quarter of fiscal 2008 in the range of $0.05 to $0.07 per fully diluted share, compared with earnings of $0.07 per fully diluted share for the comparable quarter last fiscal year. These results are preliminary in nature and subject to change based on the completion of the Company's normal quarter-end review process.

> Michael F. Golden, President and CEO of Smith & Wesson Holding Corporation, said, "While second quarter sales growth came in strong at 36% to 40%, our results were impacted by a combination of factors that emerged late in the quarter. Among these factors were softness in the market for hunting rifles and shotguns, driven by lower than expected consumer demand, a buildup of pre-season retail inventories, and unseasonably warm autumn weather, which decreased retail traffic and compressed the fall hunting season. Sales of our Thompson/Center

Arms hunting rifles, which have a brand name that is already well-established in the consumer hunting market, appear to be far less impacted by these factors than are sales of new Smith & Wesson rifles and shotguns, which have only just begun to arrive in retail locations."

Sales in the sporting goods channel in the second quarter of fiscal 2008, which include revenue from our acquisition of Thompson/Center Arms, and our expansion into the long gun market for rifles and shotguns, were approximately 56% higher than sales for the comparable quarter last year. On a six month basis, sales in the sporting goods channel were up approximately 76% over sales for the comparable period last year. We continue to expand the presence of our M&P polymer pistol line in the sporting goods channel, and preliminary reports for the second quarter of fiscal 2008 indicate that the M&P line will deliver year-over-year revenue growth exceeding 55%. We experienced lower than planned sales of our non-M&P pistol products in the second quarter of fiscal 2008, the result of several competitors offering deep discounts to distributors and retailers, in what we believe is an effort to eliminate their excess inventories. We intend to respond to this competitive environment in the remainder of fiscal 2008 with a series of consumer pull promotions. While the cost of these promotions is expected to somewhat impact second half gross margins, we believe they will drive demand at the customer level to fuel increased sales of Smith & Wesson products in the sporting goods channel throughout the balance of fiscal 2008.

In the law enforcement channel, sales in the second fiscal quarter of last year included a $1.9 million, non-recurring order from the California Highway Patrol. Excluding that order, sales in the law enforcement channel for the second quarter of fiscal 2008 grew by approximately 30% on a year-over-year basis. To date, 247 law enforcement agencies have selected or approved for duty our M&P polymer pistol.

International sales of approximately $8.2 million were robust during the second quarter reflecting growth of approximately 134% over sales of $3.5 million for the comparable quarter last year. International sales in the current quarter included shipments to key customers in the Pacific Rim, Canada and Latin America.

Sales to the federal government in the second fiscal quarter of last year included $4.5 million in shipments to the Afghanistan National Police. There have been no new contract awards for handguns issued by the federal government thus far in the current fiscal year.

Golden said, "We now expect revenue to increase to approximately $325 million in fiscal 2008, which is lower than our previous guidance of $330 million but which represents a 38% increase over fiscal 2007 revenue. This revenue expectation does not include the results of any potential future diversification initiatives, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government, and international markets. Due to the increased investment in consumer focused

promotional programs, we now expect full fiscal 2008 gross margins of 33.5% to 34.5%, lower than our previous gross margin guidance of 35% to 36%, but higher than fiscal 2007 gross margins of 32.3%. We now expect fiscal 2008 net income of approximately $23.5 million, or $0.53 per diluted share, which is lower than our earlier expectation of $28.5 million, or $0.63 per share, but which represents an increase of 81% over net income for fiscal 2007. This reduction is attributable to the lower second quarter revenue results combined with the cost of the anticipated promotional programs."

Golden concluded, "We remain firmly committed to our strategy to become a global leader in safety, security, protection and sport. We are excited about the opportunities we have to expand in our existing firearms markets and equally excited about opportunities we see for diversification. We look forward to sharing details of our progress in the near future." (Emphasis added.)

43.     The Individual Defendants caused the Company to formally announce its 2Q08 financial results in a press release dated December 6, 2007. The December 6, 2007 press release contained a further reduced outlook for FY08, down another 25% to $0.40 per share. According to the December 6, 2007 press release:

SPRINGFIELD, Mass., December 6, 2007 — Smith & Wesson Holding Corporation (NASDAQ Global Select: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for its second fiscal quarter ended October 31, 2007.

Net product sales for the quarter ended October 31, 2007 were $70.8 million, an increase of 39.4% over the comparable quarter last year. Gross margin increased to 32.3% for the quarter ended October 31, 2007 as compared to 31.2% for the same period last year. Net income of $2.9 million, or $0.07 per fully diluted share, for the quarter ended October 31, 2007 was $87,000 higher than the comparable quarter last year. Net income of $7.6 million, or $0.18 per fully diluted share, for the six months ended October 31, 2007 was $1.4 million, or $0.03 per fully diluted share higher than for the six months ended October 31, 2006. Net income for the second quarter of fiscal 2008 reflects a 54.5% year-over-year increase in operating expenses, combined with a $1.7 million year-over-year increase in interest expense, both attributable to the acquisition of Thompson/Center Arms in January 2007.

* * *

As we announced last month, our results for the second quarter of fiscal 2008 in the consumer channel were impacted by a combination of factors, including softness in the market for hunting rifles and shotguns driven by lower than

expected consumer demand, an industry-wide buildup of pre-season retail inventories, and unseasonably warm autumn weather, which compressed the fall hunting season. Within the consumer channel, the reduced retail activity not only affected long guns but handguns as well, and was compounded by the fact that inventory in the channel was at an extremely high level, due in part to the anticipation of a strong hunting season. In fact, during the first six months of calendar 2007, federal excise tax data indicates that industry-wide long gun sales into the distribution channel increased 20% year-over-year and handgun sales increased 37% year-over-year. However, federal background check data, which is an indicator of retail purchases, reflects that retail purchases for the same period of time increased by only 5.2%. The resulting, industry-wide inventory buildup, accentuated by lower retail traffic, caused order activity to slow beginning in October. Several manufacturers responded with significant discounts on both long guns and handguns. This caused increased price competition in the channel and served to exacerbate already inflated inventory levels.

Early feedback on our handgun promotions, designed to clear Smith & Wesson product from the sales channel, has been positive. However, industry-wide channel inventories remain high, limiting the ability of both distributors and dealers to purchase products and thereby limiting our sales.

Golden concluded, "Despite circumstances that occurred in our consumer channel during the second quarter and that appear to be continuing throughout the fiscal year, both our long-term outlook and our strategy remain unchanged. Our ongoing sales growth in sporting goods despite the inventory over-stock situation indicates that we continue to grow market share within the consumer channel. Our acquisition and integration of Thompson/Center Arms continues to meet all of our expectations. Moreover, we are dedicated to expanding the Smith & Wesson brand more deeply into non-consumer sales channels and into new non-firearms categories that will diversify our base of revenue and build upon our reputation for safety, security, protection and sport. Today we filed a Form 8-K indicating that we have increased our credit facility to $110 million. We believe this expanded resource positions us to be fully prepared to take advantage of opportunities to grow our business both organically and through acquisitions.

*Fiscal 2008 Outlook*

We now expect net product sales to increase to approximately $300 million in fiscal 2008, which would represent a 28% increase over fiscal 2007 net product sales. This expectation does not include the results of any potential future diversification initiative, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government and international markets. We expect gross margins of approximately 32%, a reduction from our earlier expectations, reflecting increased promotional costs, an extended Springfield plant shutdown in December, and the lower absorption rate of overhead costs due to lower production volumes. We now expect net income for the fiscal year ending April 30, 2008 of approximately

$17.0 million, or $0.40 per diluted share, which would represent an increase in net income of 33% over net income for fiscal 2007, and an increase in earnings of $0.09 per diluted share, or 29%, over the fiscal year ended April 30, 2007.

We are adjusting our capital expenditure expectations for the balance of fiscal 2008 to reflect our current sales and net income projections. Capital expenditures are now expected to be $15.9 million, a decrease of approximately $1.8 million from our previously announced projection. (Emphasis added.)

*Individual Defendants' Knowledge of the Misconduct*

Individual Defendants Renegotiate Golden's Employment Contract

44.     Despite the fact that the Individual Defendants' October 29, 2007 announcement caused a dramatic one day 39% decline in the Company's stock price, from which the Company's stock price has never recovered, on November 12, 2007, Individual Defendants inexplicably caused the Company to enter into a new employment agreement with defendant Golden (the "2007 Employment Agreement").   Although the Compensation Committee was charged with reviewing and recommending the CEO's compensation, the CEO's compensation was ultimately approved by the entire Board.

45.     Prior to November 12, 2007, Golden was employed at the Company pursuant to an employment agreement dated February 1, 2006 (the "2006 Employment Agreement").  The 2006 Employment Agreement provided that the Company would employ Golden for an initial term of three years, and then could continue to employ Golden on an annual basis thereafter. The 2006 Employment Agreement, among other things, provided Golden with a $450,000 annual salary, a car allowance, and participation in the Company's employee benefits and programs.

46.     The 2007 Employment Agreement continued Golden's $450,000 annual salary, but provided the Board with express authority to increase Golden's salary, which authority was not specifically granted in the 2006 Employment Agreement.  Further, the 2007 Employment

Agreement awarded to Golden options to purchase 216,000 shares of Company common stock at an exercise price of $15.00 per share – approximately 39% above the Company's November 12, 2007 trading price of $10.80 per share, but approximately 46% below the Company's October 29, 2007 trading price of $20.09 per share – and restricted stock units for 160,000 shares of the Company's common stock. Furthermore, the 2007 Employment Agreement guaranteed that the Company would employ Golden for at least a three year term. At the time of the 2007 Employment Agreement, there remained more than one year of the initial three year term under the 2006 Employment Agreement.

47. Defendant Golden has received only three stock option grants during his tenure at S&W: December 6, 2004; July 19, 2005; and November 12, 2007. Curiously, each of these three option grants was designed to benefit defendant Golden as they were deliberately timed to coincide with the public dissemination of Company financial data the effect of which rendered the grants more favorable to Golden.

48. Golden's December 6, 2004 option grant was for 500,000 stock options with an exercise price of $1.47 per share. On December 9, 2004, the Company reported its 2Q05 earnings, which improved upon the Company's three and six month results from 2Q04. By December 31, 2004, the Company's stock increased to $1.75 per share, a 19% increase over the exercise price of the options.



49.     Golden's July 19, 2005 option grant was for 100,000 options with an exercise price of $4.46 per share. On July 29, 2005, the Company announced that it reaffirmed its FY05 guidance, expecting an 11% increase in firearms sales, a 5% increase in net product sales, and substantially increased earnings. On July 29, 2005, the Company's stock price shot up 25% from its prior day close to close at $5.97 per share, a 34% increase over the exercise price of the options.



50.     Golden's November 12, 2007 option grant was for 216,000 stock options with an exercise price of $15.00 per share.  On October 29, 2007, the Company revised downward its earnings guidance by 16% - a total of $5 million, or $0.10 per share – as discussed herein.  The Company's stock dropped by nearly 40% to close at $12.12 on October 30, 2007, and continued to slide to close at $10.80 per share on November 12, 2007.  Regardless, the timing of the November 12, 2007 option grant allowed Golden to take advantage of the bad news and obtain stock option grants with an exercise price far lower than he would have had the Board not waited until after the announcement of the downward revision of its earnings guidance to make the grant to Golden.



51.    Defendant Golden's December 6, 2004 and July 19, 2005 option grants were carefully timed by the Board to take advantage of positive financial news that the Board knew would result in an increase of the Company's stock price, thus providing defendant Golden with a substantial financial gain.  Similarly, defendant Golden's November 12, 2007 option grant was carefully timed by the Board to *avoid* negative financial news – i.e., the October 29, 2007 guidance reduction.

The Securities Action

52.    There is presently pending in this Court an action entitled *In re Smith & Wesson Holding Corp. Sec. Litig.*, C.A. No. 07-cv-30238-MAP (the "Securities Action").  The Securities Action alleges that defendants Golden, Kelly, Monheit, and the Company violated U.S. federal

securities laws by knowingly disseminating to the market false and misleading statements, as alleged herein in paragraphs 31-40.

53.     On March 26, 2009, the Court denied defendants' motion to dismiss the Securities Action.  The Court held that the statements in paragraphs 28-39 herein contained "intentionally false statements of present or historical fact[.]"  As the Court noted, "Defendants made statements such as 'demand has been strong,' 'growth in demand exceeded 59%,' and 'our sales growth was particularly strong,'" statements that preclude dismissal of the Securities Action. Indeed, the Court held that the defendants "had no justification for projecting high revenue growth."

*The Company's 2008 Equity Offering & Damages to the Company*

54.     On May 19, 2008, the Company entered into an agreement (the "Equity Underwriting Agreement") with Deutsche Bank Securities Inc. (as representative of several underwriters) pursuant to which the underwriters would purchase from the Company 6,250,000 shares of S&W common stock for $5.17 per share for the purpose of selling said stock into the public markets.  According to the Company's public filings, the Company received from this transaction net proceeds of approximately $31.9 million.

55.     Between October 29, 2007, when Individual Defendants began to reveal their misconduct to the public, and May 19, 2008, the Company's stock price dropped from $20.09 per share to $6.17 per share, a decrease of more than 69%.

56.     The underwriters paid to the Company $1.00 per share less than the May 19, 2008 closing price of the Company's common stock, a discount of more than 16%.  Selling the Company's stock to the underwriters at a discount was necessary in light of the October and December 2007 revelations of the Company's poor business prospects.  Indeed, during the week

of October 26, 2009, the Company's beta,[2] was approximately 0.71.  After shocking investors with the October 29, 2007 press release, the Company's beta spiked to approximately 0.94 during the week of November 2, 2007, and to 1.02 by the week of November 9, 2007.  By the week of May 16, 2009, when the Company entered into the Equity Underwriting Agreement, S&W's beta was 1.15, as demonstrated in the following chart.



57.   The underwriters demanded to purchase the Company's stock at a steep discount in order to protect against the risk of continued stock depreciation.  As could be expected, the Company's stock continued to slide in 2008, falling to $5.77 per share by the end of May 2008, and bottoming out at $1.58 per share on October 28, 2008.

---

[2] Beta is "[a] quantitative measure of the volatility of a given stock, mutual fund, or portfolio, relative to the overall market, usually the S&P 500. Specifically, the performance the stock, fund or portfolio has experienced in the last 5 years as the S&P moved 1% up or down. A beta above 1 is more volatile than the overall market, while a beta below 1 is less volatile." *See* http://www.investorwords.com/468/beta.html.

58.     Absent the Individual Defendants' misconduct, the Company would have raised more capital in the 2008 stock offering without diluting the Company's equity base.

## INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY

59.     During the relevant period, the Individual Defendants received numerous reports regarding problems with the Company's lack of adequate internal and financial controls and its problematic accounting practices and procedures.  Through their attendance at Board, Audit Committee, and management meetings; their review of the Company's financial statements; and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that S&W lacked adequate internal and financial controls.

60.     In breach of both their fiduciary duty of good faith and, with respect to the members of the Audit Committee, their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants willfully ignored the obvious and pervasive problems with the Company's lack of adequate internal and financial controls, as well as the Company's problematic accounting practices and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

61.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, S&W has sustained significant damages, including, but not limited to, lost proceeds in connection with its 2008 equity offering.

## DERIVATIVE AND DEMAND ALLEGATIONS

62.     Co-Lead Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

63.     Co-Lead Plaintiffs will adequately and fairly represent the interests of S&W and its shareholders in enforcing and prosecuting its rights.

64.     Co-Lead Plaintiffs are owners of S&W common stock and were owners of S&W common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

65.     On May 28, 2009, Plaintiff Nance made a demand (the "Nance Demand") on the Board to commence an action against certain directors and executive officers of S&W. A copy of the Nance Demand is attached hereto as Exhibit A.

66.     On June 5, 2009, Plaintiff Bundy made a demand (the "Bundy Demand", and together with the Nance Demand, the "Demands") on the Board to commence an action against certain directors and executive officers of S&W. A copy of the Bundy Demand is attached hereto as Exhibit B.

67.     On July 6, 2009, counsel for S&W wrote a letter to Co-Lead Plaintiffs' counsel in which S&W's counsel stated that the Company formed a Special Litigation Committee ("SLC") of the Board to investigate the Demands. The members of the SLC were not identified. According to S&W's counsel, upon completion of the SLC's investigation, Co-Lead Plaintiffs and their counsel "will be notified of the SLC's response to [the] demand letter as well as an overview of the SLC's investigatory process and the bases for its determination."

68.     Neither the Demands nor the SLC was even mentioned in the "Legal Proceedings" section of S&W's most recent form 10-Q, filed with the SEC on December 10, 2009, and there is no other indication from S&W's public filings or otherwise regarding what, if any, investigation the SLC has done or intends to do nor when, if ever, the SLC or the Board intends to respond to the Demands.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

69.     Co-Lead Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

70.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared and presented in such a fashion so as not to be misleading, and, when put on notice of problems with the Company's lack of adequate internal and financial controls, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

71.     As alleged herein, the Individual Defendants willfully ignored the obvious and pervasive problems with S&W' financial statements, accounting practices and lack of effective internal controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

72.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

73.     Co-Lead Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

74.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner, and to act in furtherance of the best interests of the Company.

75.     As alleged herein, the Individual Defendants increased investment in production capacity and new product lines while knowing that demand for the Company's products was lower than publicly reported, and that such investments were not supportable.

76.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

WHEREFORE, Co-Lead Plaintiffs demand judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Recovering for the benefit of the Company the additional funds that the Individual Defendants caused to be invested in production capacity and new product lines while knowing that such investments were not supportable;

C.     Ordering appropriate equitable relief to remedy Defendants' misconduct;

D.     Awarding to Co-Lead Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: January 29, 2010                 Respectfully submitted,

DOHERTY, WALLACE, PILLSBURY &
MURPHY P.C.


s/ Robert L. Leonard
Robert L. Leonard
Deborah A. Basile
1414 Main Street
Springfield, MA 01144-1900
Telephone: (413) 733-3111
Facsimile: (413) 734-3910

*Co-Lead Plaintiffs' Liaison Counsel*

BARROWAY TOPAZ KESSLER MELTZER
   & CHECK, LLP
Eric L. Zagar
Michael J. Hynes
James H. Miller
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Plaintiffs' Lead Counsel*

## VERIFICATION

I, Dwight M. Nance, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the Verified Consolidated Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _Jan. 22, 2010_          _Dwight M. Nance_
                               Dwight M. Nance

## VERIFICATION

I, Art Bundy, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the Verified Consolidated Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 1-22-2010

Art Bundy

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2010, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system which will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF).

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 29, 2010.

DOHERTY, WALLACE, PILLSBURY & MURPHY P.C.

s/ Robert L. Leonard
Robert L. Leonard
Deborah A. Basile
1414 Main Street
Springfield, MA 01144-1900
Telephone: (413) 733-3111
Facsimile: (413) 734-3910

Email: rleonard@dwpm.com