```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

IN RE SMITH & WESSON           )
HOLDING CORPORATION            )
DERIVATIVE LITIGATION          )
                               )
                               )    C.A. NO. 09-cv-30174-MAP
                               )
```

<u>MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS</u>
(Dkt. No. 13)

October 20, 2010

**PONSOR, U.S.D.J.**

## I. <u>INTRODUCTION</u>

Co-lead Plaintiffs Art Bundy and Dwight M. Nance filed this shareholder derivative suit on behalf of Smith & Wesson Holding Corporation ("S&W" or "the Company") alleging that from June 2007 to December 2007 S&W knowingly made false statements, with the approval and/or acquiescence of its directors and officers, regarding the Company's earnings and business prospects for fiscal year 2008. This derivative suit parallels a securities class action currently pending before this court, <u>In re Smith & Wesson Holding Corp. Securities Litigation</u>, No. 07-cv-30238-MAP (D. Mass.) ("the Securities Class Action").

The complaint contains two counts, each alleging a

breach of fiduciary duty by Defendants: S&W's President and Chief Executive Officer, Michael F. Golden; S&W's former Chief Financial Officer, John A. Kelly; five outside directors, Barry M. Monheit, Jeffrey D. Buchanan, John B. Furman, and I. Marie Wadecki; two former officers who now serve on the Board, Mitchell A. Saltz and Robert L. Scott; and a former outside director, Colton R. Melby.[1]

Defendants now move to dismiss this action on four separate grounds: (1) the complaint is premature; (2) the court lacks personal jurisdiction over eight of the Defendants; (3) the complaint fails to sufficiently plead a claim of fraud pursuant to Federal Rule of Civil Procedure 9(b); and (4) the complaint fails to state a claim upon which relief may be granted pursuant to Federal Rule 12(b)(6).  Because the complaint is manifestly premature, the Motion to Dismiss will be allowed, and the court need not address Defendants' other arguments.

## II. FACTS[2]

---

[1] The parties have agreed to dismiss Defendant David M. Stone, who passed away in November 2009.

[2] The court's summary of the facts is taken principally from Plaintiffs' Amended Complaint (Dkt. No. 12), with all

S&W is a Nevada corporation. Through its subsidiaries, S&W manufactures firearms and related products in Springfield, Massachusetts.

From June 14, 2007 to December 6, 2007 (the "Relevant Period"), S&W issued a series of financial statements in the form of press releases, earnings conference calls, and annual and quarterly reports filed with the SEC. These statements assured shareholders that there was a robust need for the Company's handguns and that the Company would be expanding manufacturing to meet this growing need. In late 2007, the Company revealed preliminary financial results that reflected a sharp departure from its prior earnings estimates, causing stock prices to plummet.

On May 28, 2009, Plaintiff Nance, a stockholder of the Company, issued a demand letter requesting that S&W's Board commence litigation against all named Defendants. This letter alleged that each individual breached fiduciary

---

factual allegations assumed to be true and all reasonable inferences drawn in Plaintiffs' favor. See Waterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Although Defendants object to all characterizations of the Company's statements as "false and misleading" and to any suggestion that they knowingly or intentionally misled Plaintiffs, the parties substantially agree on the facts alleged.

duties of loyalty, good faith, and due care in the following ways:

> [F]rom June 2007 to December 2007, Smith & Wesson, with the knowledge, approval and/or acquiescence of the Directors and Officers, knowingly made false statements regarding the Company's earnings and business prospects for fiscal year 2008 and the first two quarters thereof. [These statements] concealed from [the Company's] shareholders that the Company's sales merely represented stocking transactions, not true growth. . . . As a result of the foregoing breaches of duty, Smith & Wesson has sustained damages, including, but not limited to, increased cost of capital in connection with the Company's 2008 secondary offering of common stock.

(Dkt. No. 12, Amended Compl. Ex. A.)  Plaintiff Bundy issued an identical demand letter on June 5, 2009.

About five weeks later, on July 6, 2009, the Board responded by letter, explaining that a Special Litigation Committee ("SLC") comprised of independent and disinterested members of the Board was appointed on June 22, 2009 to evaluate the demands.  The letter advised Plaintiffs that, upon completion of the investigation, Plaintiffs "will be notified of the SLC's response to your demand letter as well as an overview of the SLC's investigatory process and the bases for its determination." (Dkt. No. 14, Defs.' Mem. Supp. Mot. Dismiss, Ex. 1.)  The letter further requested

additional information from Plaintiffs regarding their capacity to serve as derivative plaintiffs under Rule 23.1 -- an item not addressed in the demand letters. (Id.) Plaintiffs did not respond.

On August 17, 2009, the SLC sent a second letter to Plaintiffs requesting "additional information concerning the nature and scope of the stockholder demands" because the demand letters did not provide sufficient information "for the SLC to make a meaningful evaluation of the stockholder demands." (Dkt. No. 14, Defs.' Mem. Supp. Mot. Dismiss, Ex. 3.) The letter further stated,

> No doubt, the Company made many statements during [the Relevant Period]. We need to know which statements the stockholders claim are false and who made them, as well as the basis for the claim that the "Company's sales merely represented stocking transactions."

(Id.)

Plaintiffs responded to the SLC by letter on September 24, 2009, stating that "all the information the SLC needs to consider and respond to the demand letter is already within the possession, custody and control of Smith & Wesson." (Dkt. No. 14, Defs.' Mem. Supp. Mot. Dismiss, Ex. 4.)

On October 14, 2009, the SLC sent a third letter in

which it reiterated its need for additional information and announced that it would proceed with the investigation regardless:

> We have reviewed the pleadings in [the Securities Class Action].  The claims that remain . . . are sufficiently detailed so as to enable the SLC to proceed with its investigation and evaluation. . . . [W]e are left with no choice but to assume that your clients have effectively adopted the pending claims and allegations in the class action lawsuit.  Accordingly, the SLC will plan to structure its investigation and evaluation as to those claims and allegations only.

(Dkt. No. 14, Defs.' Mem. Supp. Mot. Dismiss, Ex. 5.)

The following day Plaintiffs Nance and Bundy filed derivative complaints.  After this court ordered the two suits consolidated, Plaintiffs filed the complaint presently before this court.  Unlike the demand letters, the complaint contains a detailed list of the reports containing allegedly false and misleading statements, including:

- a press release on June 14, 2007;

- an earnings conference call involving Defendants Golden and Kelly on June 14, 2007;

- a 10-K filed with the SEC on July 16, 2007, discussing the results of the June 14 press release and conference call;

- a press release on September 6, 2007;

- an earnings conference call involving Defendants Golden and Kelly on September 6, 2007; and

- a 10-Q filed with the SEC on September 10, 2007, discussing the results of the September 6 press release and conference call.

(Dkt. No. 12, Amended Compl. ¶¶ 31-41.)  Plaintiffs allege that these actions caused the Company to lose substantial capital in a 2008 stock offering with Deutsche Bank Securities, Inc., and to incur expenses in the investigation of its business practices.

Based on the above allegations, Plaintiffs assert two counts against all Defendants for breach of fiduciary duty: (1) "Defendants willfully ignored the obvious and pervasive problems with S&W'[s] financial statements, accounting practices and lack of effective internal controls," and (2) "Defendants increased investment in production capacity and new product lines while knowing that demand for the Company's products was lower than publicly reported, and that such investments were not supportable."  (Id. ¶¶ 71, 75.)

### III. DISCUSSION

As noted, Defendants have moved to dismiss this action

on four separate grounds. Because this lawsuit is so clearly premature, it is not necessary to address Defendants' remaining arguments.

    A.   <u>Prematurity: Law and Facts</u>.

Defendants assert that Plaintiffs' suit was premature when it was filed on October 15, 2009, approximately four and a half months after Plaintiffs' first demand on the Board. This period of time was insufficient for the SLC to conduct a full investigation, Defendants argue, and Plaintiffs' decision to file suit before receiving a response was an unlawful circumvention of the corporate governance process.

It is well established that "[a] shareholder derivative action is an action of last resort." <u>Gonzalez Turul v. Rogatol Distrib., Inc.</u>, 951 F.2d 1, 2 (1st Cir. 1991). The Supreme Court expounded on this longstanding principle over one hundred years ago:

> [B]efore the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes.

Hawes v. Contra Costa Water Co., 104 U.S. 450, 460-61 (1882). The shareholder "must make an earnest, not a simulated effort . . . to induce remedial action." Id. at 461. Thus, before filing a derivative action, a plaintiff must either present a written demand to the Board or explain why demand would be futile.[3] Aronson v. Lewis, 473 A.2d 805, 811-12 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000). This requirement is consistent with the general principle that "the responsibility for determining whether or not a corporation shall enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management." Landy v. F.D.I.C., 486 F.2d 139, 146 (3d Cir. 1973). It follows that "federal courts should not interfere in the matters of private corporations, nor should they sanction the interference by shareholders with the duties of the board of directors unless it is clear that the board has no intention of taking appropriate action."

---

[3] Plaintiffs do not argue that demand was futile. In fact, by issuing a demand rather than pleading that demand was excused, Plaintiffs have "tacitly concede[d] the independence of a majority of the board to respond." Spiegel v. Buntrock, 571 A.2d 767, 777 (Del. 1990).

Brooks v. Am. Exp. Indus., Inc., 68 F.R.D. 506, 510 (S.D.N.Y. 1975).

To ensure compliance with the demand requirement, Federal Rule of Civil Procedure 23.1 requires a shareholder to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority . . . and the reasons for his failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1(b)(3). The First Circuit has "vigorously enforced" this standard. Heit v. Baird, 567 F.2d 1157, 1160 (1st Cir. 1977).

However, Federal Rule 23.1 only establishes pleading requirements and does not define substantive rights or obligations. Kamen v. Kemper Financial Servs., 500 U.S. 90, 96 (1991); Gonzalez Turul, 951 F.2d at 2. To understand the contours of the demand requirement, courts must look to the law of the state of incorporation, id., which in this case is Nevada. Nevada courts, in turn, generally look to Delaware for guidance on issues of corporate law, and the demand requirement is no exception. In re Comp. Scis. Corp. Deriv. Litig., Nos. 06-05288 MRP (Ex), 06-06512 MRP (Ex),

2007 WL 1321715, at *4 (C.D. Cal. Mar. 26, 2007) (citing Shoen v. SAC Holding Corp., 137 P.3d 1171, 1179-80 (Nev. 2006)).

Under Delaware law, there is no precise rule governing how much time must elapse following a demand on a corporation before plaintiffs may file suit.[4] Allison v. Gen. Motors Corp., 604 F. Supp. 1106, 1117-18 (D. Del. 1985), aff'd, 782 F.2d 1026 (3d Cir. 1985). In fact, length of time is not the primary consideration:

> The question in premature filing cases is not how much time is needed to respond to the demand, but whether the time between demand and filing of suit was sufficient to permit the Board of Directors to discharge its duty to consider the demand.

---

[4] Courts have dismissed as premature derivative suits that were filed at various times after the initial demand. See, e.g., Piven v. Ryan, No. 05-cv-4619, 2006 WL 756043, at *3-4 (N.D. Ill. Mar. 23, 2006) (eight months); MacCoumber v. Austin, No. 03-c-9405, 2004 WL 1745751, at *5 (N.D. Ill. Aug. 2, 2004) (four months); Charal Investment Co., Inc. v. Rockefeller, No. 14397, 1995 WL 684869, at *4 (Del. Ch. Nov. 7, 1995) (five months); Renfro v. F.D.I.C., 773 F.2d 657, 659-60 (5th Cir. 1985) (two months); Mozes on Behalf of Gen. Electric Co. v. Welch, 638 F. Supp. 215, 221-22 (D. Conn. 1986) (eight months); Recchion v. Kirby, 637 F. Supp. 1309, 1319 (W.D. Pa. 1986) (two months). Cf. Rubin v. Posner, 701 F. Supp. 1041, 1046 (D. Del. 1988) (concluding suit was not premature when filed one month after demand where "only three defendants are named, no investigation was undertaken by the board, and all the issues gravitate toward a single alleged agreement").

> Generally, if demand is required, the amount of time needed for a response will vary in direct proportion to the complexity of technological, quantitative, and legal issues raised by the demand. . . .  It follows that the content of the demand is the determining factor in whether the complaint was filed prematurely.

Id. (citations omitted).  The test is one of "reasonableness under the circumstances."  Mozes on Behalf of Gen. Electric Co. v. Welch, 638 F. Supp. 215, 220 (D. Conn. 1986).  When making this determination, courts must consider whether the Board was given "*full* knowledge of the basis for the claim and [a] *full* opportunity to act."  Halprin v. Babbitt, 303 F.2d 138, 141 (1st Cir. 1962) (emphasis supplied).

Applying the foregoing principles to this case, the court concludes that Plaintiffs' suit was premature. Approximately four and a half months elapsed between Plaintiffs' first demand letter, sent on May 28, 2009, and the complaint filed on October 15, 2009.  As noted, this length of time holds little import in itself.  The key question is whether four and a half months was sufficient for the SLC to fully investigate the issues raised in Plaintiffs' letters.  See Allison, 604 F. Supp. at 1117-18. Four factors illustrate why in this case that period of time

was flatly insufficient.

    First, the breadth and vagueness of the demands created serious difficulties for the SLC from the outset.  The demands generally alleged that "from June 2007 to December 2007, Smith & Wesson, with the knowledge, approval and/or acquiescence of the Directors and Officers, knowingly made false statements regarding the Company's earnings and business prospects . . . ."  The demands then listed ten individuals (all ten Defendants) who were in some unspecified way responsible for making unidentified false statements during that period.  At a bare minimum, Plaintiffs could have provided the dates and times of the allegedly deceptive press releases and other reports later included in the complaint.  Instead, Plaintiffs put the burden on the SLC to hunt down anything and everything the ten named individuals said in the seven-month period between June and December 2007 and determine for themselves what was potentially actionable.

    Plaintiffs suggest that the SLC should have known that Plaintiffs' demands mirrored the pending Securities Class Action.  As explained below, this argument is unpersuasive.

It is not the SLC's responsibility to guess which statements Plaintiffs believe to be potentially actionable.

Second, the extent and complexity of the alleged misconduct warranted a probing and scrupulous investigation. Based on Plaintiffs' broadly worded demands, the investigation required an analysis of the following statements issued by the Company between June and December 2007: a press release on June 14, 2007; an earnings conference call involving Defendants Golden and Kelly on June 14, 2007; a 10-K filed with the SEC on July 16, 2007, discussing the results of the June 14 press release and conference call; a press release on September 6, 2007; an earnings conference call involving Defendants Golden and Kelly on September 6, 2007; and a 10-Q filed with the SEC on September 10, 2007, discussing the results of the September 6 press release and conference call.  Moreover, the allegation that these statements were not based on "true growth" required an extensive review of the Company's financial records during that time and an analysis of the accuracy of each statement within that context.  This was no simple task.  Furthermore, the allegation that these

statements caused the Company to suffer "increased cost of capital in connection with the Company's 2008 secondary offering of common stock" added an additional complex dimension to this already arduous research project.

Third, Plaintiffs' blanket refusal to elaborate on these demands delayed the investigation. The Board first responded to Plaintiffs' demands on July 6 explaining that it had formed a Special Litigation Committee and requesting that Plaintiffs provide evidence that they had standing to bring a derivative claim. As noted, Plaintiffs did not respond. On August 17, the SLC sent a second letter requesting additional information and highlighting specific sections of the demand that required elaboration. This time, Plaintiffs did not respond for more than a month, and, when they did, it was to tell the SLC that it had all the information it needed. This refusal then prompted a third letter from the SLC on October 14 reiterating its need for more information. The letter also explained the SLC's intention to commence the investigation despite Plaintiffs' failure to elaborate. Plaintiffs filed suit <u>the next day</u>. At best, Plaintiffs' course of conduct had the unintended

effect of impeding the SLC's investigation. At worst, it demonstrates a repeated refusal to cooperate and a disregard for the importance of the investigation process.

Fourth, despite these obstacles, the SLC took steps to commence an investigation into Plaintiffs' demands. Defendants formed a Special Litigation Committee to oversee the matter, and the SLC made multiple attempts to gather information from Plaintiffs so that it could focus its investigation. Unlike the Board in <u>Allison</u>, Defendants did not simply "brush off" Plaintiffs' demands. <u>Allison</u>, 604 F. Supp. at 1117-18. To the contrary, the SLC's actions illustrate an earnest effort to investigate the matter at hand.

Plaintiffs' counter arguments are unpersuasive. First, they argue that "Defendants [ ] summarily state that the SLC needs more time, even though the SLC has not said anything to support such a statement." (Pls.' Mem. Supp. Opp'n Mot. Dismiss 15 n.16). That statement is false. As discussed above, the SLC sent three letters requesting additional information and, even after being rebuffed, announced its intention to use the pleadings from the Securities Class

Action as its guide. This occurred on October 14, and Plaintiffs filed suit on October 15. Certainly, the SLC's October 14 letter was not suggesting that it would complete the investigation within a twenty-four hour time frame.

Plaintiffs also assert that the existence of the Securities Class Action was enough to put the SLC on notice as to what Plaintiffs' demands were. In their demand letters, however, Plaintiffs made no reference to the pending Class Action at all. The SLC is not obliged to assume that Plaintiffs sought an investigation of every statement alleged in the Class Action and no others. Plaintiffs have the responsibility to make their demands clear enough so that the SLC can conduct a focused investigation. See Halprin v. Babbitt, 303 F.2d 138, 141 (1st Cir. 1962).

Finally, Plaintiffs contend that, at present, more than a year has passed since the filing of their demand and that certainly by now the SLC has had a full opportunity to investigate. This argument flies in the face of the demand process. Plaintiffs cannot issue a vague demand letter, rebuff the SLC's requests for clarification, file suit, and

then claim that the intervening litigation has provided the requisite opportunity to investigate. The SLC must be given an opportunity to investigate the demand <u>prior</u> to the filing of a derivative suit, not during it. <u>See</u> <u>Hawes</u>, 104 U.S. at 460-61.

In sum, Plaintiffs have improperly treated the demand requirement as a mere formality. Plaintiffs failed to provide the SLC with a sufficient opportunity to investigate the demand before filing suit. Accordingly, the complaint is premature, and Defendants' Motion to Dismiss will be allowed.

  B. <u>Ongoing Jurisdiction over the Case</u>.

Plaintiffs further submit "in the event that the Court finds that the Action was prematurely filed, the appropriate action is to stay, not dismiss the Action . . . because the SLC has not yet made a determination." (Pls.' Mem. Supp. Opp'n Mot. Dismiss 15 n.16.) Plaintiffs do not offer any support for this claim, and, in fact, courts have repeatedly found that dismissal is the appropriate action when faced with a premature filing. <u>See, e.g.</u>, <u>MacCoumber v. Austin</u>, No. 03-c-9405, 2004 WL 1745751, at *6 n.5 (N.D. Ill. Aug. 2,

2004); <u>Charal Investment Co., Inc. v. Rockefeller</u>, No. 14397, 1995 WL 684869, at *4 (Del. Ch. Nov. 7, 1995); <u>Mozes on Behalf of Gen. Electric Co. v. Welch</u>, 638 F. Supp. 215, 222 (D. Conn. 1986).

Indeed, a distinct possibility exists that the SLC will choose to take control of the litigation following a complete investigation. Alternatively, the SLC may reject Plaintiffs' demands, in which case Plaintiffs will have the option to file a new action alleging that the Board's decision not to sue constituted a breach of fiduciary duty. <u>See</u> <u>Zapata Corp. v. Maldonado</u>, 430 A.2d 779, 784 (Del. 1981). Either scenario would undercut the present suit.

In addition, allowing this suit to stagnate for weeks or months while the investigation continues would create a burden for the parties and for the court. Plaintiffs present no countervailing reasons to stay the proceeding. Therefore, the suit will be dismissed without prejudice.

The court's conclusion does not relieve Defendants of their responsibility to pursue these allegations. Just as dissident shareholders have a duty to "make an earnest, not a simulated effort" to obtain remedial action from the

corporation, Hawes, 104 U.S. at 460-61, so too must the corporation fulfill a reciprocal duty to conduct a good faith investigation into the matter. Mills v. Esmark, Inc., 91 F.R.D. 70, 73 (N.D. Ill. 1981). "Neither the demand nor the response . . . should be an exercise in idle ceremony." Id. If several months pass after the date of this order without any progress by the SLC, the time may well arrive for a shareholder derivative suit.

Because Plaintiffs' complaint is premature, the court declines to address Defendants' remaining arguments in favor of their Motion to Dismiss.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint (Dkt. No. 13) is hereby ALLOWED, and Plaintiffs' claims are DISMISSED without prejudice. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge